

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

*Leah B. Grossi*
*Assistant United States Attorney*
*Leah.Grossi@usdoj.gov*

*Mailing Address*
*6500 Cherrywood Lane, Suite 200*
*Greenbelt, MD 20770-1249*

*Office Location*
*6406 Ivy Lane, 8th Floor*
*Greenbelt, MD 20770-1249*

*DIRECT 301-344-4235*
*MAIN 301-344-4433*
*FAX 301-344-4516*

May 5, 2021

Liz Oyer, Esq.
Office of the Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770

   Re: United States v. David Annor,
      Criminal No. GJH-20-446

Dear Counsel:

  This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, David Annor (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **5:00 p.m. on June 4, 2021**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

  1. The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

### Elements of the Offense

  2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland, (1) the Defendant and at least one other person entered into the unlawful agreement charged in the Indictment, that is, an agreement to commit one or more of the substantive money laundering offenses described under 18 U.S.C. § 1956; (2) the Defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the Defendant knowingly and willfully became a member of that conspiracy.

## Penalties

3. The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1956(h) | N/A | 20 years | 3 years | $500,000 (or twice the value of the property involved) | $100 |

      a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

      b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

      c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

      d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

      e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

      f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

    h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

  5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

  6.  This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that the following United States Sentencing Guidelines ("U.S.S.G") apply:

    a.  The base offense level is **6**, pursuant to U.S.S.G. § 2S1.1(a)(1) and U.S.S.G. § 2B1.1(a)(2).

    b.  An **18**-level increase applies, pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(J), because the actual or intended loss within the scope and in furtherance of the conspiracy and reasonably foreseeable to the Defendant was more than $3,500,000, but not more than $9,500,000.

    c.  A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved 10 or more victims.

    d.  A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(10)(B), because a substantial part of the fraudulent scheme was committed from outside the United States.

e. A **2**-level increase applies, pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because the Defendant will be convicted under 18 U.S.C. § 1956.

f. This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Superseding Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further

that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

i. The Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds any sentence within the advisory guidelines range resulting from an offense level of 27; and

ii. This Office reserves the right to appeal any term of imprisonment to the extent that it is below any sentence within the advisory guidelines range resulting from an offense level of 27.

c. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Restitution

11. The Defendant agrees that, pursuant to 18 U.S.C. §§ 2259, 3663 and 3663A, and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to this Office, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and this Office may seek to be relieved of its obligations under this Agreement.

## Forfeiture

12. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable

to the offenses, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities, including but not limited to, a forfeiture money judgment of at least $3,909,336 in U.S. currency, and the following seized funds:

    a. $7,281.36 in U.S. Currency seized on or about November 13, 2020 from a JPMorgan Chase account ending in 3520 held in the name of Lesley Annor;

    b. $1,872.79 in U.S. Currency seized on or about November 13, 2020 from a TD Bank account held in the name of Co-Conspirator 1; and

    c. $181.14 in U.S. Currency seized on or about November 13, 2020 from a PNC Bank account held in the name of Co-Conspirator 1.

14. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. This Office agrees to seek the Attorney General's approval to apply forfeited assets to the Defendant's Restitution Order.

15. The Defendant agrees to assist fully in the forfeiture of the above property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

16. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Defendant's Conduct Prior to Sentencing and Breach

17. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will

cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Court Not a Party

19. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

20. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Jonathan F. Lenzner
Acting United States Attorney

_Leah B. Grossi_ Digitally signed by LEAH GROSSI
Date: 2021.05.05 22:10:57 -04'00'

Leah B. Grossi
Thomas P. Windom
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

05/21/21
Date

David Annor

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

5/21/21
Date

Liz Oyer, Esq.

9

# ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Between May 2017 and October 2020, the Defendant, **DAVID ANNOR** ("**DAVID**"), knowingly conspired with his brother, **Lesley Annor** ("**Lesley**"), and **Co-Conspirator 1** to launder over $6,200,000 from over 200 victims throughout the United States and overseas. **DAVID**, **Lesley**, and **Co-Conspirator 1** received money from these victims as part of a romance fraud scheme in which co-conspirators induced the victims, often people who were elderly and isolated, to send money to **DAVID**, **Lesley**, and **Co-Conspirator 1** based on romantic assertions and other misrepresentations, including promises to travel to the United States to unite with the victims.

Co-conspirators of the scheme found the victims online, typically through Facebook or dating websites, and the co-conspirators communicated with the victims using email, cell phones, and online applications. Once the co-conspirators convinced the victims to trust them, the co-conspirators would tell the victims to send or transfer money to bank accounts and physical addresses linked to **DAVID**, **Lesley**, and **Co-Conspirator 1**. After the victims sent or transferred money, **DAVID**, **Lesley**, and **Co-Conspirator 1** would take a cut of the victim's money, typically 10%, for themselves and then send or transfer the remainder of the money to co-conspirators located in Ghana.

### *Financial Scope of Conspiracy*

**DAVID**, **Lesley**, and **Co-Conspirator 1** laundered over $6,200,000 through approximately 34 bank accounts, across 11 financial institutions (the "scheme accounts"). The scheme accounts were both personal bank accounts opened by **DAVID**, **Lesley**, and **Co-Conspirator 1** and business accounts opened by **DAVID** and **Co-Conspirator 1**. **DAVID** laundered victim payments through business bank accounts opened under the name Ravid Enterprise LLC ("Ravid Enterprise"), a business **DAVID** opened and over which he had control. **Co-Conspirator 1** laundered victim payments through a separate business bank account ("CC-1 Account") which he opened and over which he had control. At least $3,909,336 in victim payments were made into personal and business bank accounts controlled by **DAVID**.

Victims sent money to **DAVID**, **Lesley**, and **Co-Conspirator 1** by wire, bank transfer, check payments, and cash. The following chart is a summary of the victim payments that were deposited into the scheme accounts by wire, bank transfer, and check payments, between May 2017 and October 2020, and does not include over $900,000 in additional cash deposits that were made into the scheme accounts during the same time period.

| Name on Account | Financial Institution | Last Four Numbers on Account | Amount of Inflows from Victims |
|---|---|---|---|
| **David Annor** | | | |
| David Annor | BB&T | 2885 | $269,869 |
| David Annor | BB&T | 4392 | $4,000 |
| David Annor | Capital One | 6797 | $201,870 |
| David Annor | Citibank | 5998 | $490,474 |
| David Annor | JP Morgan | 3771 | $917,465 |
| David Annor | JP Morgan | 5270 | $341,300 |
| David Annor | JP Morgan | 7281 | $293,975 |
| David Annor | M&T Bank | 5105 | $39,000 |
| David Annor | M&T Bank | 9528 | $44,681 |
| David Annor | Sandy Spring | 9200 | $30,000 |
| David Annor | SunTrust | 4114 | $288,829 |
| David Annor | Wells Fargo | 5030 | $80,831 |
| | | **Total** | **$3,002,294** |
| **Lesley Annor** | | | |
| Lesley Annor | BB&T | 9581 | $53,980 |
| Lesley Annor | BOA | 5957 | $36,340 |
| Lesley Annor | JP Morgan | 3520 | $174,198 |
| Lesley Annor | SunTrust | 5477 | $17,550 |
| Lesley Annor | TD Bank | 0580 | $39,001 |
| Lesley Annor | TD Bank | 3415 | $87,325 |
| Lesley Annor | Wells Fargo | 4653 | $38,000 |
| | | **Total** | **$447,872** |
| **Ravid Enterprise** | | | |
| Ravid Enterprise | PNC Bank | 9109 | $19,554 |
| Ravid Enterprise | SunTrust | 4312 | $84,700 |
| Ravid Enterprise | TD Bank | 1021 | $121,025 |
| Ravid Enterprise | TD Bank | 1357 | $681,763 |
| | | **Total** | **$907,042** |
| **Co-Conspirator 1** | | | |
| Co-Conspirator 1 | BOA | **** | $7,500 |
| Co-Conspirator 1 | JP Morgan | **** | $40,500 |
| Co-Conspirator 1 | JP Morgan | **** | $318,955 |
| Co-Conspirator 1 | PNC Bank | **** | $73,238 |
| Co-Conspirator 1 | SunTrust | **** | $91,193 |
| Co-Conspirator 1 | TD Bank | **** | $24,000 |
| Co-Conspirator 1 | TD Bank | **** | $54,000 |
| Co-Conspirator 1 | TD Bank | **** | $602,253 |
| | | **Total** | **$1,211,639** |
| **CC-1 Account** | | | |
| CC-1 Account | BOA | **** | $223,755 |
| CC-1 Account | SunTrust | **** | $2,500 |
| CC-1 Account | TD Bank | **** | $483,149 |
| | | **Total** | **$709,404** |

*Seizure of Funds*

On November 13, 2020, pursuant to seizure warrants, law enforcement seized money from the following scheme accounts: (1) $7,281.36 from **Lesley**'s JPMorgan Chase ("JP Morgan") account ending in 3520; (2) $1,872.79 from one of **Co-Conspirator 1**'s TD Bank accounts; and (3) $181.14 seized from one of **Co-Conspirator 1**'s PNC Bank accounts.

*Victim 1*

One example of the scheme to defraud involved Victim 1, a woman who was born in 1965 and resides in Texas. According to Victim 1, starting in and around September 2016, Victim 1 met an individual claiming to be Bruce McGee James ("James") through Facebook. Among other methods of communication, Victim 1 spoke with James using Google Hangouts and email. James told Victim 1 that he was a military service member deployed overseas in Afghanistan, but he was set to retire and return home to the United States.

In September 2017, Victim 1 received an email from an individual purporting to be a doctor who stated that James had been in a car accident and that James needed to undergo surgery that would cost $5,000 pounds. The purported doctor instructed Victim 1 via email to send money. According to SunTrust bank records, Victim 1 wired $5,000 to a SunTrust account in the name of Ravid Enterprise (SunTrust 4312) five days after Victim 1 received the email from the supposed doctor.

In October 2017, James told Victim 1, through Google Hangouts, that James would be traveling to the United States to be with Victim 1. James asked Victim 1 to make payments to a SunTrust account in **DAVID**'s name. According to SunTrust bank records, two days after Victim 1 received the message from James, Victim 1 wired $2,470 to a SunTrust account in the name of **DAVID** (SunTrust 4114).

According to Victim 1, James did not travel to see Victim 1 and instead James asked Victim 1 to send another $1,000 because the hospital needed more money to release him. James told Victim 1 to send money to **Lesley** via Western Union. In November 2017, Victim 1 sent $1,000 to **Lesley** through Western Union.

In December 2017, James told Victim 1 to send additional money to a SunTrust account in **Co-Conspirator 1**'s name. The next day, Victim 1 wired $4,300 to a SunTrust account in **Co-Conspirator 1**'s name (SunTrust 6312). Victim 1 never met James in person and James never repaid Victim 1.

*Victim 2*

Another example of the scheme to defraud involved Victim 2, a woman who was born in 1957 and resides in Virginia. According to Victim 2, in and around September 2018, Victim 2 met an individual claiming to be Brett Fernley ("Fernley") online through Facebook. Shortly thereafter, Fernley asked Victim 2 to switch their communications to Google Hangouts. Fernley told Victim 2 that he was an underwater welder from Canada, who resided in Florida

though he was currently working near Ireland. After engaging in what Victim 2 thought were romantic conversations and gaining Victim 2's trust, Fernley began asking Victim 2 for money.

In December 2018, Fernley sent emails to Victim 2 asking for money and providing wiring instructions for a TD Bank account in the name of Ravid Enterprise. Bank records show that on December 17, 2018, and December 31, 2018, Victim 2 wired $24,835 and $20,000 respectively to a TD Bank account in the name of Ravid Enterprise (TD Bank 1357).

### *Victim 3*

Another example of the scheme to defraud involved Victim 3, a woman who was born in 1957 and resides in Hawaii. According to Victim 3, in and around October 2018, Victim 3 met an individual claiming to be John Powell ("Powell") online through the music application Smule. After meeting on Smule, Powell and Victim 3 began communicating on Google Hangouts, where they developed what Victim 3 believed to be a romantic relationship.

According to Victim 3, Powell told Victim 3 that he was a military contractor working in Afghanistan until his contract expired. Powell told Victim 3 that he had a package full of cash that he wanted to have delivered to Victim 3 until he could come pick it up from her. Powell told Victim 3 that he needed her to send him money so that he could have the package shipped to her. According to Victim 3, Powell directed her to send money to various individuals, including **DAVID**, which Victim 3 did.

To make these payments, Victim 3 purchased and mailed cashier's checks to addresses that Powell provided. Records show that Victim 3 mailed at least two Express Mail packages to **DAVID** at his and **Lesley**'s residence in Gaithersburg, Maryland, in January 2019 and March 2019. Bank records show that personal and cashier's checks totaling $17,150 from Victim 3 were deposited into various bank accounts in the names of **DAVID** and Ravid Enterprise.

### *Victim 4*

Another example of the scheme to defraud involved Victim 4, a man who was born in 1962 and resides in Washington. According to Victim 4, around June 2019, Victim 4 met an individual claiming to be Anita Heinrich ("Anita") online through the dating website Match.com. According to Victim 4, after a week of talking on Match.com, Anita told Victim 4 that she loved him. Shortly after meeting on Match.com, Victim 4 and Anita began communicating through Google Hangouts.

According to Victim 4, Anita told Victim 4 that she had just finished nursing school in Germany and would relocate to Washington to be with Victim 4. Anita said that both of her parents died and left her an inheritance. Anita further told Victim 4 that her grandfather was helping her with the inheritance and that there were various fees that needed to be paid. According to Victim 4, Anita told Victim 4 that **DAVID** and **Co-Conspirator 1** were accountants for Anita's grandfather

In September 2019, Victim 4 cashed out his 401(k) retirement account, purchased two cashier's checks totaling approximately $201,000, and mailed the cashier's checks to **DAVID** and **Co-Conspirator 1** at **DAVID** and **Lesley**'s residence in Gaithersburg, Maryland. Bank records show that multiple cashier's checks and money orders totaling $206,500 from Victim 4 were deposited into two different JPMorgan bank accounts—JP Morgan 3771 and JP Morgan 7281—that **DAVID** opened in his own name, and a TD Bank account that **Co-Conspirator 1** opened in his own name.

### *Victim 5*

Another example of the scheme to defraud involved Victim 5, a woman who was born in 1942 and resides in Georgia. According to Victim 5, in early 2018, Victim 5 met an individual claiming to be Gabriel Scott ("Scott") online while playing the game "Words With Friends." According to Victim 5, Scott told Victim 5 he was from Washington State and worked for an oil company that had him stationed on an oil rig off the coast of Venezuela. Scott said he was divorced and had two daughters, but both of his daughters died in a vehicle crash. According to Victim 5, Scott told Victim 5 he had a way to help people invest their money by putting it into a "high interest" savings account earning a guaranteed 10 percent. Scott told Victim 5 that **DAVID** and **Lesley** were the "contact people" who handled the savings account. Victim 5 developed a romantic relationship with Scott.

Bank records show that multiple cashier's checks and wires totaling $20,300 from Victim 5 were deposited into a Capital One bank account (Capital One 6797) that **DAVID** opened in his own name, a TD Bank account that **Co-Conspirator 1** opened in the name of the CC-1 Account, and two TD Bank accounts (TD Bank 0580 and TD Bank 3415) that **Lesley** opened in his own name.

### *Arrest of Lesley and DAVID*

In the early morning on November 16, 2020, law enforcement executed a search warrant at **DAVID** and **Lesley**'s residence in Gaithersburg, Maryland. As part of the search, law enforcement obtained electronics and cell phones belonging to **DAVID** and **Lesley**.

At the time of the search warrant on **DAVID** and **Lesley**'s residence, **DAVID** was not at home. Law enforcement went to **DAVID**'s work, but **DAVID** had left his work shift early. Law enforcement then called and texted **DAVID** in an attempt to try and locate him. **DAVID** finally answered law enforcement's calls and told law enforcement that he was driving to New York to get his laptop, and after he did that, he would come straight back and turn himself in to law enforcement. **DAVID** did not go to New York. Approximately five hours later, **DAVID** turned himself in to law enforcement.

SO STIPULATED:

_Leah B. Grossi_ Digitally signed by LEAH GROSSI
Date: 2021.05.05 22:11:24 -04'00'
———————————————
Leah B. Grossi
Thomas P. Windom
Assistant United States Attorneys

_[signature]_
———————————————
David Annor
Defendant

_[signature]_
———————————————
Liz Oyer, Esq.
Counsel for Defendant